Town of Franklin *vs.* Ruby M. Wyllie, trustee,[1] & others.[2]

Suffolk. December 8, 2004. - January 4, 2005.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Real Property,* Agricultural or horticultural use, Purchase and sale agreement, Bona fide purchaser, Right of first refusal. *Bona Fide Purchaser.*

This court concluded that a fully executed purchase and sale agreement for land valued, assessed, and taxed as agricultural or horticultural under G. L. c. 61A constituted a bona fide offer to purchase, thereby triggering a town's right of first refusal under G. L. c. 61A, § 14, even where the purchaser's obligation under the agreement was conditioned on the receipt of municipal approvals of a proposed residential subdivision plan, as well as all necessary permits, and where the purchase price stated in the agreement was not fixed but was dependent on the number of subdivision units approved. [191-196]

Civil action commenced in the Land Court Department on February 19, 2003.

The case was heard by *Leon J. Lombardi*, J., on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Mark G. Cerel*, Town Attorney, for the plaintiff.

*Leonard M. Davidson* for Mark S. Staniscia & another.

*Thomas J. Urbelis & Carol Hajjar McGravey*, for Massachusetts City Solicitors and Town Counsel Association, amicus curiae, submitted a brief.

Greaney, J. We transferred this case to this court on our own motion to decide whether a fully executed purchase and sale agreement for land valued, assessed, and taxed as agricultural or horticultural under G. L. c. 61A constitutes a "bona fide offer

---

[1] Of the Ruby M. Wyllie Investment Trust. Wyllie, as trustee, holds record title to the land that is the subject of this appeal. She takes no position in this litigation.

[2] Mark S. Staniscia and Edward M. Pericolo.

to purchase," thereby triggering a town's right of first refusal under § 14 of that chapter, when the purchaser's obligation under the agreement is conditioned on the receipt of municipal approvals of a proposed residential subdivision plan, as well as all necessary permits, and the purchase price stated in the agreement is not fixed but is dependent on the number of subdivision units approved. The town of Franklin (town) filed a complaint in the Land Court seeking, insofar as relevant here, a judgment declaring that such a purchase and sale agreement for land held in trust by Ruby M. Wyllie, as trustee of the Ruby M. Wyllie Investment Trust (trust), executed by the trust and the prospective buyers of the land, Mark S. Staniscia and Edward M. Pericolo (purchasers), did not, as of the date of its execution, constitute a "bona fide offer to purchase" under the statute. A judge in the Land Court heard cross motions for summary judgment and, based on his conclusion that the agreement was a "bona fide offer to purchase" as that term is used in G. L. c. 61A, § 14, allowed summary judgment in favor of the purchasers and entered a judgment declaring the rights of the parties. We now affirm the judgment.

The following facts are relevant for the purpose of summary judgment.[3] The trust is the record titleholder of approximately sixty-five acres of land, located in the town, that has been held as agricultural or horticultural land under the provisions of G. L. c. 61A. On September 26, 2002, an attorney for the trust informed the town by letter, as required by § 14, that the trust had received an offer to purchase the land.[4] Enclosed was a true copy of a fully executed purchase and sale agreement, dated September 20, 2002, between the trust and the purchasers. The agreement obligated the purchasers to purchase the land from the trust, subject to a right of first refusal option to the town, pursuant to G. L. c. 61A.

The agreement stated the purchase price as $2,275,000, but referenced an addendum, which provided:

---

[3] We have added to the judge's (unchallenged) findings relevant undisputed facts compiled from the summary judgment record that are useful in resolving the ultimate legal question whether summary judgment is appropriate.

[4] The record indicates that notice was sent to the town administrator, the town council, the town board of assessors, the town planning board, and the town conservation commission.

"The sale price of $2,275,000.00 is based upon the Buyer[s] obtaining approval of a [thirty-five] lot subdivision (including the Form A lots on South Street). The Buyer[s] agree to use their best efforts to maximize the number of lots in the subdivision (and the Form A lots on South Street). The best efforts of the Buyer[s] shall not include appeals to any State or Federal board, court or administrative body, if denied by the initial governing authority."

Further language in the addendum provided a formula, set forth below,[5] whereby the purchase price fluctuated with the number of lots approved. If more than thirty-five lots were approved, the purchasers were required to pay the seller an additional $65,000 for each lot in excess of thirty-five. If less than thirty-five lots were approved, the purchase price would be less than $2,275,000, depending on the number, and location, of lots approved.

The addendum also provided:

"As a condition precedent to this sale, the Buyer[s] must obtain the following permits:

---

[5]"In the event that:

"The Buyer[s] obtain[] approval for more than [thirty five] lots (including the Form A lots on South Street), then the Buyer[s] shall pay the Seller an additional $65,000 per lot for each lot over [thirty-five].

"Example — If the Buyer[s] obtain[] [thirty-six] lots then the sale price is $2,340,000.00.

"The Buyer[s] obtain[] approval for less than [thirty-five] lots (including the Form A lots on South Street), then the Buyer[s] shall pay the Seller an additional fixed sum of $42,500.00 per lot for each lot less than [thirty-five]. The number of additional payments of $42,500.00 shall not exceed twice the number of Form A lots on South Street.

"Example — If the Buyer[s] obtain[] [thirty-four] lots then the sale price is $2,252,500.00.

"Example — If the Buyer[s] obtain[] [twenty-five] lots and the number of Form A lots is [four] then sale price is $1,965,000.00"

(The addendum's formula for calculating the purchase price, when the number of approved lots is less than thirty-five, does not appear difficult. That being said, we point out that our calculations do not result in the precise figures set forth in the above examples.)

"(a) Approval of the Planning Board of the Town of Franklin of a Definitive Subdivision Plan or Plans providing for the construction of single family dwellings or units, if permitted under amended zoning by-laws.

"(b) Issuance of all permits by the Conservation Commission and Board of Health, if required, and those of any other municipal or [S]tate agency or permit-granting authority, in order to accomplish the purpose of the acquisition."

On January 13, 2003, the town administrator responded to the § 14 notice by informing the trust, by letter, that the town did not consider the agreement to constitute a bona fide offer to purchase because (1) the purchasers' obligation was conditioned on receiving all municipal approvals for a residential subdivision and (2) the agreement failed to state a fixed purchase price. The town informed the trust of its interest in acquiring the land and requested that the town be notified and given an opportunity to exercise its first refusal option once the number of lots and purchase price were finally determined.

In furtherance of its expressed interest in acquiring the land, the town entered into negotiations with the trust to purchase the land, which resulted in a preliminary agreement for the town to purchase the land, and other land held by the trust, for $2,000,000, subject to the trustee's obtaining a release from the purchasers of their rights under the agreement. On January 22, 2003, the town's legislative body (council) voted unanimously to purchase the land and authorized the town administrator to negotiate and execute a purchase and sales agreement for the land, pursuant to the above terms. On January 24, the town notified the trust of the council's vote, and, shortly thereafter, counsel for both the town and the trust prepared and submitted to the other a draft purchase and sale agreement. The following week, however, counsel for the trust notified counsel for the town that he was unable to obtain a release from the buyers and that he was, therefore, breaking off negotiations. The town, shortly thereafter, initiated litigation.

The town sought in its complaint a judgment declaring that the agreement between the trust and the purchasers did not

constitute a "bona fide offer to purchase" under G. L. c. 61A, § 14. The town also sought a judgment declaring that the agreement would not ripen into a "bona fide offer to purchase" until the purchasers had obtained approval for a specified number of subdivisions and so fixed the purchase price for the land. The purchasers responded that the agreement was a binding contract to purchase and that the town's failure to exercise its first refusal option within 120 days of receiving notice of the agreement (the time period allotted by § 14) released the trust from any obligation to the town under G. L. c. 61A, § 14. The purchasers moved for summary judgment, and the town filed a cross motion for summary judgment. As has been stated, the judge allowed the former motion. In his decision granting summary judgment in favor of the purchasers, the judge reasoned that the inclusion of contingencies in a purchase and sale agreement does not mean that the offer is not a bona fide offer when (as here) the parties intended, and executed, a binding contract to purchase. The judge rejected the town's argument that the price contained in a bona fide offer must be a stated fixed price and not one subject to significant conditions or adjustment, noting the absence of any statutory language to that effect in any provision of G. L. c. 61A.[6]

1. The sole issue on appeal is whether the purchase and sale agreement between the trust and the purchasers constituted a "bona fide offer to purchase," as that term is used in G. L. c. 61A, § 14, which reads, in relevant part:

> "Land which is valued, assessed and taxed on the basis of its agricultural or horticultural use under an application

---

[6]The judge's decision granting summary judgment made passing reference to those paragraphs in the complaint setting forth the details of its negotiations with the trust after January 13, 2003, to acquire the land. (Because the details are not disputed, we accept them as true for purposes of this summary judgment motion. See *Coveney* v. *President & Trustees of the College of the Holy Cross*, 388 Mass. 16, 17 [1983].) The judge did not address, however, an alternate form of relief requested in the town's complaint based on those facts, namely, a judgment declaring that the town had, effectively, exercised its first refusal option under § 14 when its council authorized, and its administrator conducted, negotiations to purchase the land, as well as other land owned by the trust, for $2,000,000. The town does not raise this issue on appeal. We consider it waived.

filed and approved pursuant to this chapter shall not be sold for or converted to residential, industrial or commercial use while so valued, assessed and taxed unless the city or town in which such land is located has been notified of intent to sell for or convert to such other use . . . . For a period of one hundred twenty days subsequent to such notification, said city or town shall have, in the case of an intended sale, a first refusal option to meet a bona fide offer to purchase said land, or, in the case of an intended conversion not involving sale, an option to purchase said land at full and fair market value to be determined by impartial appraisal."

The town premises its claim that the agreement was not a "bona fide offer to purchase" on its contention that, in order to be able to exercise its first refusal option, a town must be presented with the opportunity to match a stated, fixed price. The town asserts that as a legal and a practical matter, it should not be required to assume the obligations of a potential developer by pursuing the municipal approvals and permits necessary to fix the purchase price under the formula set forth in the addendum. The town points out that in the present case, the purchase price of the trust's land can only be determined after completion of the entire approval process for the purchasers' planned subdivision, including obtaining approval from the town planning board under G. L. c. 41K, § 81, as well as approvals for individual building lots from the town conservation commission under G. L. c. 131, § 40, and local bylaws, and approvals for the onsite septic disposal systems from the town board of health under G. L. c. 111.[7] Even assuming that the requisite finances and resources to complete the possibly lengthy

---

[7]The town argues, essentially, that it is incapable of determining the number of lots that would be approved for development purposes and, thus, is ultimately incapable of determining the offered purchase price it must meet to exercise its first refusal option. The purchasers reply that it is not unusual for a town to undertake financial obligations without knowing the precise cost and suggest that the town easily could establish, through pursuit of preliminary subdivision approval, the number of lots that would ultimately be approved. The purchasers also suggest that language in § 14 providing that after a public hearing, a town may assign its first refusal option "to a nonprofit conservation organization under such terms and conditions as the mayor or board of selectmen deem appropriate" was intended by the Legislature specifi-

and expensive approval processes are available, the town argues that it is unreasonable that it be required to obtain approval of a subdivision and individual building lots it has no intention of developing, merely to establish a purchase price for the undeveloped land. The town submits that its interpretation comports with the clear language of § 14 and, moreover, would effectuate the legislative purpose behind G. L. c. 61A, to preserve the Commonwealth's remaining agricultural land.

The purchasers' position, on the other hand, is that a "bona fide offer to purchase" exists where the seller receives an enforceable offer, regardless whether that offer includes contingencies or whether the ultimate purchase price depends on the actual number of lots approved. The purchasers assert that the existence of a number of contingencies does not make an agreement unenforceable, or any less of a "bona fide offer," because they are contractually obligated to use their best efforts to maximize the number of lots in the subdivision. The purchasers argue that implicit in the concept of a bona fide offer is the notion that, under a bona fide offer, a fair market value price is to be paid. Section 14 expressly provides that this fair market value will be determined by the bona fide offer (in the case, as here, of a third party sale) or by an appraisal at the land's highest and best use (in the case of a conversion of use). Either way, the purchasers assert, a valuation of the property's highest and best use requires an analysis of the maximum use which could be derived from the property. Further, when the proposed purchase is of undeveloped land zoned for residential purposes, as here, any appraisal necessarily takes into account the type of assessment called for in the agreement. In light of the unambiguous statutory language, we conclude, as did the Land Court judge, that the position of the purchasers is the more persuasive.

There is no question that the agreement sets forth valid and enforceable terms to constitute a binding agreement to exchange the land for a price to be arrived at pursuant to the formula set

cally to provide a mechanism whereby a town could avoid the anomalous situation it describes. According to the purchasers, a conservation organization could fulfill without difficulty obligations too cumbersome for a town. The record does not present adequate information to allow us to take a position on the merits of either the town's stated argument or the purchasers' proffered solutions.

forth in the addendum. See *Lafayette Place Assocs.* v. *Boston Redev. Auth.*, 427 Mass. 509, 518-519 (1998), cert. denied, 525 U.S. 1177 (1999). It is true that, under the agreement, the sale of the land and its purchase price are contingent on the land being approved for subdivision and the number of lots approved. The agreement, however, imposes on the purchasers an express obligation to use their best efforts to maximize the number of lots in the subdivision, as well as an implied obligation to act in good faith and deal fairly with the trust. See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471 (1991). The time of performance is specified under well-defined terms. If, despite diligent efforts on the part of the purchasers, they have failed to obtain all requisite approvals by October 1, 2003, then, upon written notice, the time for performance automatically extends to the earlier of October 1, 2004, or thirty days subsequent to the receipt of final approval. The existence of contingencies concerning obtaining approvals are common in real estate transactions and do not make the agreement any less than a bona fide offer. See *Rizika* v. *Donovan*, 45 Mass. App. Ct. 159, 163 (1998), citing *Charles River Park, Inc.* v. *Boston Redev. Auth.*, 28 Mass. App. Ct. 795, 803-804 (1990).

The unambiguous language of G. L. c. 61A provides that the owner of five acres or more of land that has been in agricultural or horticultural use for the "two immediately preceding tax years," G. L. c. 61A, § 4, may apply to the board of assessors to have the land assessed on the basis of its value for agricultural purposes only, and not on its value as judged by the "highest and best use" standard under which real property customarily is assessed. *Sudbury* v. *Scott*, 439 Mass. 288, 294 (2003). Under § 14, once a parcel of land is so assessed, the land may not be sold for, or converted to, residential, industrial or commercial use unless the municipality in which the land is located has been notified of the owner's intent to sell or convert. The municipality then has an option to acquire the land, by meeting "a bona fide offer to purchase" the land or, in the case of conversion not involving sale, by purchasing the land at "full and fair market value."

We recently had occasion to review the legislative history of

G. L. c. 61A in comprehensive fashion in *Sudbury* v. *Scott, supra* at 299-301, and will not repeat all that was said in that decision. The Legislature enacted G. L. c. 61A under the authority of art. 99 of the Amendments to the Massachusetts Constitution, in direct response to its concern over the escalating loss to development of the Commonwealth's agricultural and horticultural land, to encourage the continuation of active farming and horticultural uses, and to discourage conversion of agricultural and horticultural land to other uses. See *id.* at 300-301. As we stated in the *Sudbury* decision, "[t]he right of first refusal created by § 14 manifests a legislative intent to do more than help make farming [and horticultural uses] economically feasible by providing a tax incentive." *Id.* at 301. The right of first refusal was intended to provide a mechanism to allow a municipality actively to preserve and protect agricultural and horticultural land within its borders.

"The common meaning of a right of first refusal involving real estate is well established," and its use in a statutory context imparts no new meaning to the phrase. *Greenfield Country Estates Tenants Ass'n* v. *Deep*, 423 Mass. 81, 89 n.14 (1996). "On notice of a bona fide offer from a third party, a right of first refusal ripens into an option to purchase according to [the] terms" of the offer. *Id.* at 89. See *Roy* v. *George W. Greene, Inc.*, 404 Mass. 67, 71 (1989), *S.C.*, 408 Mass. 721 (1990) (right of first refusal exercised when "owner has decided to accept a third person's outstanding and enforceable offer and the holder of the right has been informed of the details of that offer and has had a reasonable time to meet it"). There is no indication, however, that the Legislature intended that a municipality's "first refusal option" to purchase would encompass the right to purchase such land on different terms and conditions than set forth in the "bona fide offer." See *Sudbury* v. *Scott, supra* at 299 n.14 (§ 14 must be read in "commonsense fashion to effectuate the purpose of the statute"). We discern no compelling reason to read such an intention in the statute. Accordingly, to meet the purchasers' bona fide offer, the town was required to purchase the land on substantially the same terms and condi-

tions as presented in the agreement.[8] See *Stone* v. *W.E. Auchbuchon Co.*, 29 Mass. App. Ct. 523, 527 (1990) ("It is basic, of course, that an option may be exercised only in strict compliance with its terms").

In summary, we conclude that there is nothing in the extensive legislative history of G. L. c. 61A, the unambiguous language of § 14, or in our cases interpreting that language which would allow us to read into the statute terms an exclusion for "bona fide offers" contained in a fully executed and enforceable purchase and sale agreement. In reaching our conclusion, we understand that remedial statutes such as G. L. c. 61A are to be liberally construed to effectuate their goals, see *Deas* v. *Dempsey*, 403 Mass. 468, 470 (1988), and that § 14, ordinarily, must be interpreted in a manner that will not frustrate or impair a town's right of first refusal. See *Plante* v. *Grafton*, 56 Mass. App. Ct. 213, 217 (2002), and cases cited. Here, however, the result is constrained by the actual language of the statute. The town did not exercise its option, activated on notification of the intended sale of the land to the purchasers, within 120 days. Accordingly, summary judgment properly was allowed in favor of the purchasers.

2. A few final comments are in order. In enacting the statute in 1973, the Legislature may not have directly contemplated the type of purchase and sale agreement executed here. Such agreements are undoubtedly common between developers and sellers, as the former seek realistically to minimize risk on an expensive purchase as they prudently undertake obtaining approvals necessary for a definitive subdivision before the transfer of title. The present language of the statute, nevertheless, obligates the town, if it is to exercise its right of first refusal, to "meet a bona fide

---

[8]The town suggests "potentially unlimited" situations where a "collusive seller and buyer [might] craft an agreement which defeats a municipality's [§ 14] first refusal option" and, thereby, "subvert the Legislative purpose embodied in [the statute] of protecting the Commonwealth's remaining agricultural land from development." We emphasize that there is no allegation of collusion or impropriety in the purchase and sale agreement in this case. The fact that an agreement contains certain contingencies carries with it no implication of bad faith. See *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp.*, 441 Mass. 376, 384 (2004), citing *Mucci* v. *Brockton Bocce Club, Inc.*, 19 Mass. App. Ct. 155, 158-159 (1985). We need not, therefore, address this aspect of the town's concerns.

offer to purchase." G. L. c. 61A, § 14. In this case, this meant accepting, within 120 days, the terms of the purchase and sale agreement, including the "agreed purchase price" of $2,275,000, as modifiable (upwards or downwards) by the terms of the addendum. This would have necessitated expense by the town in determining, through its own officials and experts, the ultimate number of permissible lots in the proposed subdivision. But this is a consequence stemming from the nature of the obligation imposed by the statute, until such time as the Legislature chooses to amend the statute to state differently. It must be remembered that once the town acts, properly, it has a right that supersedes the rights of the seller and purchaser and which entitles the town ultimately to acquire for its purposes a large and valuable tract of land.

*Judgment affirmed.*